# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JEFFREY CHRISTOPHER LYNCH,** | **Civil Action No. 14-4470 (JLL)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **STATE OF NEW JERSEY, et al.,** | |
| **Respondents.** | |

**LINARES**, Chief Judge:

Currently before the Court is the petition for a writ of habeas corpus of Jeffrey Christopher Lynch ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court convictions (ECF No. 1, 12).[1] Following an order to answer, Respondents filed responses to the petition (ECF Nos. 7-8, 20-21), to which Petitioner has replied. (ECF No. 31). For the following reasons, this Court will deny the petition and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction, the New Jersey Appellate Division provided the following factual summary of the background of this matter:

> [i]n March 1991, [Petitioner] was indicted by a Passaic County grand jury on the following charges: (1) three counts of first degree aggravated sexual assault on children less than thirteen [in violation of N.J. Stat. Ann. §] 2C:14-2(a)(1), against female children whose initials are L.L., G.C., and S.C. (counts one, two and three); (2)

---

[1] In this matter, Petitioner filed two separate habeas petitions on the same date, docketed at ECF Nos. 1 and 12. Each petition contains claims which address one of Petitioner's two sets of PCR proceedings/hearings, and it is clear from the record in this matter that Petitioner's intention was to raise all of the claims raised in the two petitions, and it is the petitions combined that represent the entirety of Petitioner's habeas challenge.

seven counts of second degree sexual assault [in violation of N.J. Stat. Ann. §] 2C:14-2(b), against female children whose initials are L.L., G.C., S.C., C.L., J.S., J.E.S., and J.M.S., who were less than thirteen while [Petitioner] was at least four years older (counts four through ten); and (3) seven counts of fourth degree endangering the welfare of a child [in violation of N.J. Stat. Ann. §] 2C:24-4(a), with respect to the same seven children (counts eleven through seventeen). On April 14, 1991, [Petitioner] entered a plea of not guilty to the charges, but thereafter, [Petitioner] who claimed to suffer from multiple personality disorder, was found not competent to stand trial. On November 8, 1993, Judge Vincent E. Hull, Jr., continued the incompetency determination. Another competency hearing took place before Judge Hull over four days between December 5, 1994, and April 27, 1995. On June 16, 1995, Judge Hull found [Petitioner] competent to stand trial. Three years later, another competency hearing took place before Judge Donald R. Reenstra. Judge Reenstra also found [Petitioner] competent to stand trial.

From January 5 through 12, 1999, Judge Reenstra heard testimony and argument on several defense motions, including motions to suppress a statement that [Petitioner] had given to an investigator from the Passaic County prosecutor's office, to exclude the tender years hearsay statements of some of the victims, and to dismiss the indictment on the ground that [Petitioner]'s right to a speedy trial had been violated. On January 12, 1999, Judge Reenstra denied all of [Petitioner]'s motions.

A jury trial before Judge Reenstra commenced the next day. During the trial, Judge Reenstra dismissed counts three and ten of the indictment because the child victim involved in these charges, J.M.S., was not able to testify.

Jury deliberations began on February 4, 1999. On February 10, the jury reached a verdict. [Petitioner] was found guilty of counts one, two, four, five, six, eight, and nine, and counts eleven through seventeen. He was found not guilty on count seven, which was the charge of sexual assault upon C.L.

[Petitioner] was [ultimately] sentenced on June 4, 1999, to an aggregate term of twenty-five years. . . .

Of the seven alleged victims, all but J.M.S. testified. All of the young women's testimony focused largely on three episodes involving [Petitioner]. These episodes occurred on the night of a tornado in late summer 1990; during a barbeque at the home of

Uncle Chris, a relative of [Petitioner], which apparently took place on Labor Day 1990; and on February 2, 1991. Not all of the girls were allegedly involved in all of the incidents, although they were together in different combinations during each of them.

The alleged victims, during the 1990-91 time period, lived in roughly the same neighborhood and attended the same school. It is unnecessary to repeat the sordid evidence in detail. Instead, we will recite certain testimony respecting only a few of the incidents for which [Petitioner] was tried and on which the jury could have predicated its verdict.

The first involved the tornado in the summer of 1990, when all five girls slept in L.L.'s room. When J.E.S. went to bed that night, [Petitioner] came into the room, lay down and rubbed J.E.S.'s back and chest and between her legs. J.S. was sleeping on the bunk bed, and L.L. and J.M.S. were in the living room. J.E.S. was wearing a nightgown at the time. Although [Petitioner] touched underneath her nightgown, it was over her underwear. The rubbing between J.E.S.'s legs lasted a "couple minutes."

[Petitioner] also went over to J.S. and rubbed his hands over her chest underneath her nightgown. [Petitioner] also rubbed her bare buttocks and fondled her vaginal area by putting his hand inside her underwear. This went on for about five minutes.

The second major incident with [Petitioner] appears to have occurred during a barbeque at Uncle Chris's house on Labor Day 1990, which all of the girls attended. Uncle Chris lived on a lake and owned a couple of boats. G.C. testified that, while she was at the barbeque, [Petitioner] "would just start playing rough with us, throwing us around, and then he would start touching us." In the living room, he touched G.C. on her chest and between her legs[.] When [Petitioner] touched G.C., it was done under her clothes in an attempt to move his finger from the outside to the inside of her vagina. When the girls swam in the lake, [Petitioner] allegedly touched their chests underneath their bathing suits.

On another occasion, on February 2, 1991, there was a sleepover at the residence of one of the victims. At one point, [Petitioner] started chasing the girls around the house, and he "wouldn't leave [them] alone." [Petitioner] would not let the girls go into the bedroom, as he did not want them to go to sleep. L.L. sat on the stairs and watched the movie that a grown-up was watching in the living room. [Petitioner] sat down a few stairs above her and put his arms around her, fondled her breasts and played with

3

her hair. He also took her up to the landing on the stairs, made her lie on her stomach, and put a blanket over her. [Petitioner] pushed up her nightgown, rubbed her back, and kissed her on the buttocks.

On February 7, 1991, [Petitioner] gave a written statement to an Investigator Most. It commenced at 7:40 p.m., followed by a break five- to ten-minutes later, and finally concluded at 9:40 p.m. [Petitioner]'s brother was not present in the room at the beginning of the statement, and [Petitioner] did not consult with his brother before the beginning of the statement.

Just after the statement began, Most testified, [Most] confirmed that [Petitioner] had read and signed the *Miranda* rights form. When [Petitioner] was asked if he signed the form agreeing to speak to Most, the following occurred, according to Most.

At this point [Petitioner] requested to relieve himself and asked to have his brother in the room and to explain what was transpiring. We took a break at that time.

Judge Reenstra denied [Petitioner]'s motion to suppress the statement. According to Judge Reenstra, [Petitioner] believed suppression was appropriate because of (1) his mental illness, which was evidenced by his suicidality; (2) his intense fear of his brother; (3) [t]he brother's expressed anger toward [Petitioner]; (4) his implicit threats and pressure exerted upon [Petitioner]; (5) [Petitioner]'s inability to deny his brother or disregard his commands; (6) [Petitioner]'s inability to understand what was occurring before and during the interrogation; and (7) [Petitioner]'s having been taken to the police station unknowingly and against his free will at the request of the State's agents.

There was no evidence, Judge Reenstra found, that [Petitioner]'s brother or anyone else had threatened [Petitioner] prior to or at the time [Petitioner] gave his statement. With respect to [Petitioner]'s claimed mental illness, the only testimony Judge Reenstra recalled was that [Petitioner] had had some problem as a teenager. [The judge] observed that [Petitioner] had flown helicopters in the military but that he had not been discharged due to a physical, medical, or psychological condition. Judge Reenstra further found that there was no evidence of extreme anguish at the time [Petitioner] gave his statement and that there was no evidence that [Petitioner] feared his brother. There was no evidence that [Petitioner]'s brother was angry with [Petitioner] over the allegations and expressed his anger in any coercive or threatening

way. According to Judge Reenstra, the brother's response was to help all involved, including [Petitioner], and there was no evidence that he pressured [Petitioner] into giving a statement. In fact, [Petitioner's brother] left the room when [Petitioner] started talking. If [Petitioner]'s brother had wanted to pressure [Petitioner], he would have remained.

There was no proof that [Petitioner] could not defy or disregard [Petitioner]'s commands. Indeed, in the summer of 1990, the brother had told [Petitioner] to stop touching the girls, but [Petitioner] continued to do so. There was no evidence that [Petitioner] did not know what was going on while he was being questioned, and Most testified that [Petitioner] had spoken freely and answered the questions intelligently, albeit in a rambling fashion.

Finally, Judge Reenstra rejected the assertion that [Petitioner] had been taken to the police station against his free will. [Petitioner]'s brother told him where they were going just before they arrived, and the fact that they sat outside for a while and smoked cigarettes was not indicative of someone who did not want to go into the building. In addition, there was no evidence that [Petitioner] had entered the building reluctantly.

In sum, Judge Reenstra was satisfied that the State had established beyond a reasonable doubt that [Petitioner] knowingly, voluntarily, and intelligently waived his [*Miranda*] rights, including the right to counsel. The judge also was satisfied that the statement given by [Petitioner] was voluntary and intelligent.

(Document 24 attached to ECF No. 7 at 1-8).

Following his conviction and sentence, Petitioner appealed, but the Appellate Division affirmed his conviction, largely for the reasons expressed by the trial court. (*Id.* at 9-11). Petitioner then filed a petition for certiorari, which was denied by the New Jersey Supreme Court in March 2002. *State v. Lynch*, 171 N.J. 445 (2002). On June 30, 2003, Petitioner filed a *pro se* petition for post-conviction relief, which the PCR court denied on December 1, 2006, following a hearing. (*See* Document 1 attached to ECF No. 7 at 3). Petitioner appealed, and the Appellate Division affirmed on June 18, 2009. (*Id.*). Petitioner also filed with his appeal a motion to supplement the

record based on medical records recovered after the denial of PCR and based on the testimony of Dr. Crain, a doctor who had reviewed Petitioner and his record during some of Petitioner's competency proceedings. (*Id.* at 9). While the Appellate Division denied that motion, they did so "subject to [Petitioner]'s right to file a new PCR" based on these documents. (*Id.*).

While Petitioner did not file a second PCR, the PCR court took this denial without prejudice as a remand for the purpose of further hearings on Dr. Crain and the "new" medical records. (*See* Document 4 attached to ECF No. 7 at 5). Following those hearings, the PCR court once again denied relief, and Petitioner appealed. (*Id.*). The Appellate Division again affirmed the denial of PCR relief on December 19, 2013. (*Id.* at 4-9). Petitioner also filed another motion to supplement the record, which the Appellate Division denied. (Document 7 attached to ECF No. 7). Petitioner thereafter filed a petition for certiorari as to both PCR appeals, which the New Jersey Supreme Court denied on July 3, 2014. *See State v. Lynch*, 218 N.J. 275 (2014). Petitioner thereafter filed his current habeas petition on or about July 15, 2014. (ECF Nos. 1, 12).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C.

§ 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. Analysis

### 1. Petitioner's Ineffective Assistance of Counsel Claims

In his habeas petition, Petitioner presents several claims alleging that he suffered ineffective assistance of counsel. The standard which applies to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v.*

7

*Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the

> prejudice prong first where it is dispositive of a petitioner's claims.
> *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).


**a. Petitioner's diminished capacity defense claim, and claim that counsel was ineffective for failing to call Dr. Crain at trial**

Petitioner's chief claim of ineffective assistance arises out of his contention that his trial counsel proved inadequate in failing to raise a diminished capacity defense at trial rather than the reasonable doubt defense counsel chose to pursue. "The law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009). Where a petitioner's ineffective assistance claim challenges a strategic choice of counsel, such as a decision as to what defense to pursue at trial, scrutiny of that choice "must be highly deferential" and the "court must indulge a strong presumption" that counsel's conduct was reasonable. *Id.* at 124 (quoting *Strickland*, 466 U.S. at 688-89). Where such a strategic choice is made after thorough investigation of the law and facts, the reasonableness of counsel's choice is "virtually unchallengeable." *Id.* Where counsel chooses not to pursue an available claim or defense, counsel "is not required to have a tactical reason . . . above and beyond a reasonable appraisal of a claim's dismal prospects for success" to support his tactical choice not to pursue that claim or defense. *Id.* at 127.

The decision of what witnesses to call at trial is likewise a matter of trial strategy, and a court considering a claim based on the failure to call a witness must therefore "not simply . . . give [the] attorney[] the benefit of the doubt, but . . . affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did." *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011)). Where a petitioner fails to

rebut the "strong presumption" that counsel's decision was the result of a matter of trial strategy based on counsel's investigations into the matter at hand, any ineffective assistance claim on that basis must fail. *Pinholster*, 563 U.S. at 196.

During Petitioner's first PCR hearing, both of Petitioner's lawyers testified that, after the competency hearings, they had discussed Petitioner's competence to form the required intent at the time of the criminal actions, and that Petitioner's treating physicians had been unable to testify that Petitioner's was incompetent at the time he committed those acts. (Document 16 attached to ECF No. 7 at 19-21, 74-75). Petitioner's trial attorneys further testified that a diminished capacity defense was "considered [and] ultimately rejected" because the psychiatrist who treated Petitioner was "uncooperative," and the psychiatrist's testimony regarding Petitioner's competency at the time of the attacks "was less than supportive of [Petitioner's] position" vis-a-vis a diminished capacity defense. (*Id.* at 19-20, 75-76). Ultimately, counsel found themselves in a position where they did not have an expert willing to testify to diminished capacity, and thus rejected that defense as untenable absent clear expert testimony as to Petitioner's mental state at the time of the acts. (*Id.*). Counsel further testified that, after extensive review of the facts and interviews with the various witnesses, a decision was reached to pursue a reasonable doubt defense in which they made the lead investigator out to be the source of the criminal allegations and to be the "villain" of Petitioner's trial based on the flaws in her investigative techniques. (*Id.* at 76-80). Ultimately, the PCR court, and in turn Appellate Division, determined that counsel's credible testimony revealed extensive investigation into the issues, and a strategic choice not to pursue diminished capacity based on that investigation. (*See* Document 2 attached to ECF No. 7 at 5; Document 1 attached to ECF No. 7 at 5-6).

Following the Appellate Division's decision on the PCR, the trial court conducted a second PCR hearing based on Petitioner's allegation that Dr. Crain's testimony amounted to new evidence sufficient to show that counsel was ineffective for their failure to use Dr. Crain to pursue a diminished capacity defense. At that hearing, Dr. Crain testified that he believed, based on Petitioner's having been diagnosed with depression and more general mental issues in the late 1970s, and some ten total hours of conversations with Petitioner spread over fifteen to twenty years, that Petitioner in fact had dissociative identity disorder throughout his life, including at the time of the attacks. (Document 22 attached to ECF No. 7 at 5-12). Dr. Crain further testified that he did not believe that either Petitioner or any of his alternate personalities could have committed the attacks for which he was convicted, as Petitioner had reintegrated his alternate personalities and showed no signs of having pedophilic urges. Dr. Crain thus testified that Petitioner's confession was a fabrication which Petitioner invented because he had no memory of what his alternate personalities had done and thus assumed that he/his alternate personality must have committed the acts of which he was accused. (*Id.* at 30-32). Dr. Crain's testimony thus was that Petitioner likely was not competent at the time of the act, but that Dr. Crain did not believe Petitioner or any of his alternate personalities had committed the acts to which Petitioner confessed, but that if Petitioner's confession was genuine, it was the result of one of his alternates being in control both during the myriad acts of which Petitioner was accused and at the time of the confession. (*Id.* at 17-18, 30-32). While Dr. Crain testified that he would have so testified, he also admitted that he was hired solely for the competency hearings, and had thus never shared these opinions with counsel prior to trial as he had never been asked about the diminished capacity defense. (*Id.* at 40-41). Ultimately, Dr. Crain's opinion was that the crimes of which Petitioner was convicted were "made . . . up" by the families of the accusers. (*Id.* at 47).

Based on this testimony, the PCR court and the Appellate Division again rejected Petitioner's contention that counsel was ineffective in choosing not to pursue a diminished capacity defense. Thus, those courts concluded that counsel was not ineffective in failing to call Dr. Crain as a witness. As the PCR judge and Appellate Division explained,

> the confession of [Petitioner] was a serious blow to any defense, including the defense of diminished capacity. Dr. Crain testified [at the second PCR hearing] that [Petitioner's main] identity would not have had any memory of the actions of an alternate identity. However, during the confession [Petitioner] made corrections of the statement where something was not accurate. If [Petitioner] was acting as an altered identity at the time of the acts, then to correct the statements while making a confession, he must have been [acting through] an altered identity at that time as well. If not, as [PCR] counsel suggests here, his confession is unreliable because he was not in the altered state at the time of [the] confession [and] if he were not in an altered state at the time of the confession, then he must not have been in an altered state at the time of the acts [and must not have committed the acts]. Certainly, these conjectures could have been very puzzling to the jury.
>
> . . . .
>
> [One of Petitioner's trial attorneys] described the confession evidence as "devastating" and stated his client was "convicted by pen[.]" Attacking the confession [on the basis of Dr. Crain's testimony] could have proven equally damaging. Therefore, it is objectively reasonable that defense counsel would avoid presenting that affirmative defense and decide, instead, on putting the State to its proofs in pursuing a reasonable doubt defense.
>
> The inconsistency stated above regarding the confession, and which identity would have been reliable or unreliable dependent upon the identity which dominated [Petitioner] at the time of the act, also sheds serious doubt on whether the result of the trial would have differed with this information. Therefore, actual prejudice has not been proven by [Petitioner]. There has been no showing that "but for" counsel's [failure to use Dr. Crain to pursue a diminished capacity defense] the result of trial would have been any different.

(Document 4 attached to ECF No. 7 at 6-7). The Appellate Division agreed and affirmed, adding only the opinion that:

> [Petitioner]'s attorneys fully explored the feasibility of mounting a
> diminished capacity defense and, after considering all of the
> available evidence, including information provided by Dr. Crain,
> they made the tactical decision that their best course of action would
> be to pursue a reasonable doubt defense instead. On [Petitioner]'s
> behalf, they aggressively challenged the believability of the victims'
> accounts and vigorously attacked the credibility of the police
> investigator who was responsible for obtaining the victims'
> statements and [Petitioner]'s confession. We perceive no basis to
> second-guess [defense counsel]'s strategic decision or the [PCR]
> judge's determination that [Petitioner] failed to establish his claim
> of ineffective assistance of counsel.

(*Id.* at 8-9).

Petitioner asserts that the state courts unreasonably applied *Strickland* and its progeny in
finding that he had failed to make out ineffective assistance as to both his assertion that counsel
should have pursued a diminished capacity defense, and that Dr. Crain should have been called as
a witness to further that defense. Upon a thorough review of the extensive record of this matter,
this Court concludes that Petitioner's assertions are without merit. The record at trial establishes
that Petitioner's trial attorneys vigorously pursued their reasonable doubt defense through
extensive and powerful cross examinations of all of the state's witnesses, chiefly the police
investigator who took Petitioner's confession and interviewed the victims. The record further
indicates that counsel fully explored the possibility of pursuing diminished capacity, but found that
taking that route was less tenable than a reasonable doubt defense because Petitioner's treating
psychiatrists were unwilling to testify, and in any event would have provided testimony which was
less than helpful to any diminished capacity defense as none of Petitioner's treating physicians
could testify that Petitioner was not competent at the time he committed the acts for which he was
convicted. Although counsel may not have spoken with Dr. Crain, who at that point had only
briefly interviewed Petitioner for a few hours regarding his competency to stand trial, regarding a
diminished capacity defense, it is clear that they did pursue the possibility with Petitioner's

physician who had treated his mental illness for years, and found that such a defense was untenable. As such, there is nothing in the record which suggests to this Court that the choice not to pursue a diminished capacity defense was anything other than sound trial strategy made after a thorough investigation of the facts. As such, that choice is virtually unassailable and Petitioner has failed to show that counsel was deficient in making that strategic choice. As such, his diminished capacity defense claim must fail as the state courts' decisions were not contrary to nor an unreasonable application of federal law, nor an unreasonable application of the facts at hand.

Dr. Crain's testimony does not change this conclusion. As the PCR court noted in its decision, Dr. Crain's testimony was at best confusing – the doctor asserted that neither Petitioner nor his alternate personalities committed the offenses, but if Petitioner did commit the crimes it must have been Petitioner's alternate personalities, and if they did so, that same personality (apparently one of several) must have been the one to give and correct the confession. Dr. Crain's insistence that Petitioner's confession, including his handwritten edits to that confession, were a fabrication that Petitioner invented to cover a lack of memory likewise was confusing at best, and a jury faced with the confession which defense counsel admitted was damning and the testimony of the witnesses may well have found it directly incredible. Ultimately, the record is clear that Petitioner's counsel pursued the possibility of a diminished capacity defense, but rejected it after consultation with Petitioner's treating physicians, none of whom, unlike Dr. Crain who did not discuss the matter with counsel, could testify as to Petitioner's mental state at the time of the crime. The choice not to pursue a diminished capacity defense was thus a matter of trial strategy which this Court cannot second guess, and the decision not to call Dr. Crain was a result of that strategic choice and is likewise insufficient to establish deficient performance. Likewise, given the contradictory, confusing, and conflicting nature of Dr. Crain's proposed testimony and the strong

likelihood that it would have at best confused a jury, this Court finds that it was not an unreasonable application of law or facts for the state courts to conclude that Petitioner failed to show prejudice from either the failure to pursue diminished capacity or the failure to call Dr. Crain. As such, Petitioner is not entitled to habeas relief based on these claims.

In a related claim, Petitioner asserts that the PCR court and Appellate Division denied him Due Process during his first PCR by inadvertently failing to provide him certain medical records in the PCR court's possession and in denying Petitioner's motion to supplement the record to include those records and Dr. Crain's affidavit during his first PCR appeal.[2] Petitioner asserts that this amounts to a denial of Due Process which resulted in him having to "spen[d] another five years" pursuing his second PCR hearing and second PCR appeal. To the extent that Petitioner alleges that he was somehow denied Due Process through his inability to access those records and use them during the first PCR and during his first PCR appeal, Petitioner's claim is without merit because any error was beyond a doubt harmless – Petitioner was permitted to use those documents in his second PCR hearing and appeal therefrom, both of which resulted in a denial of relief, and his inability to use them during the first PCR and its appeal therefore did not prejudice Petitioner and thus cannot form the basis for habeas relief. *See Fry v. Pliler*, 551 U.S. 112, 116 (2007) (on collateral review, errors of even a constitutional dimension will be considered "harmless unless [they] had a substantial and injurious effect" on the outcome of criminal proceedings); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007), *cert. denied*, 552 U.S. 1108 (2008). Petitioner received any process he was due when the state courts permitted him to proceed with his second set of PCR hearings using the documents he

---

[2] Petitioner presents this related claim as ground one in both of his habeas petitions. (*See* ECF No. 1 at 5; ECF No. 12 at 5).

was denied and Dr. Crain's testimony, as well as in his appeals therefrom. Petitioner was thus not prejudiced, and any error by the state courts was undoubtedly harmless. This alleged denial of Due Process is thus no basis for habeas relief. To the extent that Petitioner asserts that he was also denied Due Process when a second motion to supplement was denied during the second PCR appeal, Petitioner has likewise failed to show that the denial of that motion had a substantial or injurious effect upon his appeal, and that claim is therefore equally incapable of entitling him to habeas relief. *Brecht*, 507 U.S. at 631.

### b. Petitioner's other witness related claims

Petitioner also asserts that counsel proved deficient in failing to call two additional witnesses – E.L., the mother of some of the victims, and Lisa Kirkjian, a Division of Youth & Family Services employee involved in the investigation of Petitioner's crimes. As to E.L., counsel testified at the PCR hearing that E.L.'s testimony was of limited value, and that most, if not all, of the positive testimony she could have provided had already been provided by other witnesses, including the assertion that some of the victims had a tendency to exaggerate or lie at the time of the attacks, and that the testimony Petitioner wished to elicit – that E.L. had had affairs with both him and his father – would likely not have produced a positive result in the eyes of the jury. Counsel further testified that E.L. could have provided as much bad testimony as good, and was therefore a witness whose testimony had the potential to hurt Petitioner as much as help him, and that counsel chose not to call her as a result. Given this testimony, the testimony of the other witnesses at trial, and the fact that counsel investigated E.L.'s testimony and determined that she would have been as much a hindrance as an aid at trial, counsel's decision not to call her as a witness at trial was clearly a matter of trial strategy which this Court cannot second guess, and

Petitioner has thus failed to show that counsel was deficient in refusing to call E.L. as a witness. The state courts' rejection of Petitioner's claim that counsel was ineffective for not calling E.L. were thus neither an unreasonable application of *Strickland* or the facts, and the failure to call E.L. thus provides no basis for habeas relief.

Petitioner's assertion that trial counsel should have called Kirkjian to the stand to cross examine her regarding her videotaped interviews of the victims and so that she could testify that Investigator Most, who had taken Petitioner's confession and investigated this matter, or other witnesses had somehow committed perjury fares no better. To the extent that Petitioner asserts that Kirkjian could have shown that Most committed perjury, there is nothing in the record which supports that assertion. As the Appellate Division noted (*see* Document 1 attached to ECF No. 7 at 8-9), Petitioner does not clearly identify what, if any, testimony was allegedly perjured, nor how Kirkjian could have exposed that perjury, and he thus cannot show that he was prejudiced by counsel's failure to call her for that purpose. Putting that aside, counsel clearly had a strategic reason for not calling Kirkjian at trial. As the Appellate Division explained in affirming Petitioner's first PCR denial, Kirkjian testified during Petitioner's *Miranda* hearing that, when she first interviewed him, he "admitted that he did everything [and] that he knew that what he did was wrong." (Document 1 attached to ECF No. 7 at 9). Defense counsel specifically made it part of the trial strategy to "keep[] that confession away from the jury" as it was a "terrible piece of evidence" that would not impeach Most, but would instead support both Most and the confession Petitioner gave her, especially in light of the fact that the testimony of both witnesses during pre-trial hearings was largely consistent and differed only on minor facts. (*Id.*). It is thus clear that the decision not to call Kirkjian was sound trial strategy, as it kept from the jury Petitioner's confession not only to having committed the acts of which he was accused, but also to having

understood that they were wrong. As such, Petitioner has not shown either deficient performance or prejudice as a result of this sound strategic choice, and Petitioner's claim thus provides no basis for habeas relief.

In a related assertion, Petitioner asserts that counsel failed to quickly acquire the pre-trial transcripts, and that this permitted the "perjury" to go unchecked during pre-trial hearings and during trial, and that counsel proved ineffective as a result. As noted above and discussed in more detail below, Petitioner fails to identify or prove that any perjury actually occurred in this matter, and has in no way shown that possession of the transcripts would have permitted a challenge to alleged perjury. Having reviewed the extensive transcripts and as explained below, this Court finds absolutely no evidence of perjury in this matter. As such, Petitioner cannot show *Strickland* prejudice as to this claim, and it must fail as well.

### c. Petitioner's claim that counsel improperly convinced him not to testify

Petitioner also asserts that counsel was constitutionally ineffective in convincing him not to testify on his own behalf. Petitioner's claim, however, is directly contradicted by the PCR record. During the first PCR hearing, Petitioner's trial counsel testified that she had "a substantial number" of conversations with Petitioner on whether he should testify. (Document 16 attached to ECF No. 7 at 87). Counsel further testified that it was her opinion that Petitioner "would have been better off being struck by a lightning bolt" and that he should not testify at trial. (*Id.* at 88). Counsel explained that statement as follows:

> There were a number of reasons [Petitioner should not testify]. The first is that there was the confession that was one of the most compelling and awful pieces of evidence I've ever seen in a criminal trial where he had made handwritten corrections on a type-written question and answer that the prosecution had very effectively shown

to the jury on blowups, and I had watched their reaction to it. And I did not know how he was going to explain that away.

Secondly, he had made comments to me during the course of my representation and conversations with him that limited what I could ask him during the course of his testifying consistent with my ethical obligations as an attorney. So while I happen to be of the school to believe that a defendant has the right to testify to a jury any way he chooses . . . [as an attorney] I have an ethical obligation not to do anything to help or suborn perjury. And I believe that if he testified and denied doing these things that I would be limited in what I could do in terms of helping him testify.

And the third [reason] is that my conversations in dealing with [Petitioner] were such that I felt that he would not be a very good witness. I didn't think he would be a very sympathetic witness. By the time we made a decision to rest at the close of the State's case, I thought he had as good a record as he was going to have for an appeal. I thought there were some very good legal issues that were in the case that should be considered seriously by the Appellate Division. And I . . . believe that often times when a defendant testifies and hurts his case while he's testifying, it can weaken his appeal.

(*Id.* at 88). Petitioner's trial counsel testified that she therefore strongly recommended he not testify, to which Petitioner agreed during each discussion of the issue they had. (*Id.*). Co-counsel, who had handled most of Petitioner's pre-trial hearings and issues agreed, and testified that he also recommended Petitioner not testify, but that both lawyers had left the issue for Petitioner to decide. (*Id.* at 21-22, 62-63).

During his own testimony during the PCR hearing, Petitioner admitted that he had conversations with his attorneys about his right to testify, that they explained to him that "if [he] were to testify . . . it would undermine [his] appeal issues and . . . would weaken [Petitioner's] appellate case." (Document 18 attached to ECF No. 7 at 28). Petitioner therefore testified that while he initially wished to testify, he "acquiesced" and agreed with counsel that he should not testify. (*Id.*). Petitioner further admitted on cross-examination that he had been told by the trial

judge that he had a right to testify, that he had told the trial judge he did not wish to testify, and

that Petitioner did not at that time claim that he was being denied his right to testify. (*Id.* at 35).

Petitioner then explained why this occurred – he admitted that he agreed with the State's assertion

that, at that time, he had "total confidence" in his attorneys and stated that he "believed [counsel's

advice not to testify] was correct." (*Id.* at 37). As the Appellate Division explained in affirming

the denial of PCR, the PCR record clearly indicates that Petitioner was "fully advised . . . of the

advantages and disadvantages of testifying, and he voluntarily and knowingly waived his right to

testify." (Document 1 attached to ECF No. 7 at 6). Because it is clear that it was Petitioner who

chose not to testify after being advised by counsel, it is clear that counsel did not deprive Petitioner

of his right to testify on his own behalf, and given the basis for that advice – the belief of both

counsel that Petitioner would prove a poor witness and likely hurt his appeal – counsel's advice

not to testify was clearly not the result of deficient performance on counsel's part. Petitioner's

claim that counsel was deficient in advising him not to testify and otherwise denied him his right

to testify on his own behalf is thus without merit and does not warrant habeas relief.[3]


## 2. Petitioner's *Miranda*-related claim

Petitioner also asserts that the state courts erred in various ways in denying his motion to

suppress the statement he gave to Investigator Most. Pursuant to the Supreme Court's decision in

---

[3] Petitioner also contends that this choice was made on the part of counsel for monetary reasons –
that counsel chose "not" to put on a defense and to recommend that he not testify because he had
no more money to pay counsel. Nothing but Petitioner's own assertions supports those contentions,
and the state courts rejected them as unsupported by the record insomuch as counsel testified at
length that the decisions were not the result of monetary issues, that counsel did put on a defense
through cross-examination, and that there were numerous reasons to advise Petitioner not to testify.
As the record fully supports these findings by the state courts, the courts' conclusion that counsel
did not act out of monetary interests is entitled to deference, and Petitioner has failed to show that
those conclusions were in any way erroneous. 28 U.S.C. § 2254(e)(1).

*Miranda v. Arizona*, 384 U.S. 436 (1966), any statement made by a criminal defendant during a custodial interrogation is inadmissible at that defendant's trial unless the defendant was provided *Miranda* warnings and "in fact knowingly and voluntarily waived [his *Miranda*] rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010). "The waiver inquiry has two distinct dimensions: waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotations omitted).

In this matter, Petitioner presents several arguments as to why his statement to the police should have been suppressed: because he believes that he was incapable of giving consent to give a statement based on his mental state at the time and thus did not knowingly waive his rights; that he was intimidated or threatened into giving a statement by his brother; and the like. The trial court in this matter, however, made detailed factual findings in which these contentions were rejected and specifically found that Petitioner was not mentally incompetent at the time of the statement, that Petitioner was not coerced into giving a statement by his brother, and that, based on the testimony at the *Miranda* hearing, Petitioner had, beyond a reasonable doubt, given his statement to Investigator Most intelligently and knowingly, and had waived his rights knowingly, voluntarily, and intelligently.

Those conclusions, which are summarized in the excerpt from the Appellate Division's opinion recounted above, were affirmed by the higher courts, and are thus entitled to deference and must be "presumed to be correct." *See* 28 U.S.C. § 2254(e)(1). Petitioner can only overcome that deference by showing "by clear and convincing evidence" that those factual conclusions were unreasonable in light of the available evidence. *Id.* Petitioner has made no such showing. Having

reviewed the extensive *Miranda* hearing record, and the trial court and Appellate Division's opinions, this Court finds that the state courts' factual findings are, in fact, well supported by the evidence presented at the hearing, and that Petitioner has presented nothing which would suggest otherwise. Petitioner has thus failed to overcome the presumption that the trial court's factual findings were correct, and, given those well supported factual findings, this Court can only conclude that the state courts' *Miranda* rulings admitting Petitioner's statements into evidence were neither unreasonable applications of *Miranda* and its progeny, nor unreasonable applications of the facts, and that Petitioner is not entitled to habeas relief.

As an alternate argument for why his statement's admission was improper, Petitioner, as elsewhere, suggests that the evidence against him and its admission were the result of a "massive" use of known perjury by the State in the form of the testimony of Most. "The Supreme Court has long held that the state's knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment. *See Giglio v. United States*, 405 U.S. 150, 153 . . . (1972); *Napue v. Illinois*, 360 U.S. 264, 269 . . . (1959); *Pyle v. Kansasi*, 317 U.S. 213, 216 . . . (1942); *Mooney v. Holohan*, 294 U.S. 103, 112 . . . (1935)." *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004). Such a violation will occur where the state either knowingly uses perjured testimony, or, knowing the testimony of a witness is false, allows it to go uncorrected. *Id.* To make out such a claim, a petitioner must show that a witness committed perjury, that the state knew or should have known that the testimony was false, that the testimony went uncorrected, and that there is a reasonable likelihood that the false testimony could have affected the trial's verdict. *Id.* A "[d]iscrepancy [in witness testimony] is not enough to prove perjury . . . [as there] are many reasons testimony may be inconsistent; perjury is only one possible reason." *Id.* at 249.

As this Court has noted elsewhere in this opinion, Petitioner does not clearly identify what testimony, if any, he believes was perjured other than to suggest that the perjury was committed by Most, and that he believes that Ms. Kirkjian's testimony could have exposed the falsehood.[4] Petitioner's argument appears to be based entirely on the fact that Kirkjian's pre-trial testimony conflicted with Most's in a few minor respects, most notably whether there was a tape recorder in the room in which Petitioner's statement was taken, a discrepancy Petitioner himself does not clearly identify. Having reviewed the record of the pre-trial hearings, this Court finds no evidence of any false testimony or perjury on Most's part – the only thing the record reveals are minor discrepancies between Most and Kirkjian, and some larger discrepancies between these two witnesses and Petitioner's brother, who testified on Petitioner's behalf. Given the fact that the trial court discounted the testimony of Petitioner's brother in favor of the mostly consistent testimony of Most and Kirkjian, this Court finds that Petitioner's vague assertion of Most having committed perjury thoroughly unsupported by the record, and rejects that argument as without merit. As noted by counsel during the PCR, Kirkjian's pre-trial testimony in no way suggests perjury by

---

[4] In his argument, Petitioner also suggests that the state protected the "perjury" of its witnesses by hiding Ms. Kirkjian and committing a fraud on the court in preventing her from testifying. This argument massively misreads the pre-trial testimony. While there was some argument over who was responsible for finding and serving her with a subpoena, Ms. Kirkjian was found by the defense and called to testify at multiple pre-trial hearings, which she did. (*See* Documents 14-19 attached to ECF No. 11). There is no evidence of any fraud on the court or other misconduct which Petitioner suggests deprived him of the ability to show perjury using Ms. Kirkjian. Clearly she was available pre-trial and thereafter, and counsel, as explained above, *chose* not to call her at trial after her pre-trial testimony revealed that Petitioner had confessed in her presence, a point the defense did not wish to expose to the jury if it could be avoided. Petitioner also suggests that the trial judge's exclusion of certain statements from the victims taken by Kirkjian was the result of perjury, but this is not the case – the trial judge excluded them based on Kirkjian's testimony that she did not remember taking them, and the court thus found them lacking in reliability. (*See* Document 18 attached to ECF No. 11 at 57-58). Perjury had nothing to do with that ruling. Petitioner's assertions to the effect that Kirkjian was hidden or unavailable to prove perjury are thus utterly without merit.

Most, and instead would have strongly supported Most's version of the taking of Petitioner's statement and would clearly have hurt, rather than helped, Petitioner's defense. Petitioner's perjury argument is without merit, as are his assertions that Kirkjian would have exposed some poorly explained conspiracy to commit perjury on the state's part, and Petitioner is not entitled to habeas relief on this ground.

### 3. Petitioner's claim related to the jury's possession of videotaped statements

In his final claim, Petitioner argues that the trial court committed error by permitting the jury to have access to the videotaped statements of the victims during deliberations, because it allowed their statements to be replayed and given undue weight and because it permitted the "testimony" of the interviewer on the tape – Ms. Kirkjian – into the jury room "never being cross-examined." (*See* Document 1 attached to ECF No. 10 at 51, ECF No. 31 at 3). This Court will turn first to the general question of the jury's access to the taped statements.

Petitioner chiefly argues in his petition that providing the taped interviews to the jury for review violated then-existing state law in violation of *State v. Michaels*, 264 N.J. Super. 579 (1993), *aff'd*, 136 N.J. 299 (1994), and was contrary to certain out of circuit decisions such as *United States v. Binder*, 769 F.2d 595 (9th Cir. 1985). A nearly identical claim was presented to another court in this District in *Parlin v. Holmes*, No. 12-3129, 2015 WL 3448194, at *4 (D.N.J. May 29, 2015). The *Parlin* court rejected that claim, noting that

> Petitioner argues, in his brief, that allowing the jury unfettered access violates New Jersey state law [and] case law outside of the Third Circuit . . . such as *United States v. Binder*, 769 F.2d 595 (9th Cir. 1985), *overruled in part on other grounds*, *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997). He cites no Supreme Court law in support of his position, and neither [the New Jersey cases] nor *Binder* [are] rooted in Supreme Court law. Rather, they are based on state law jurisprudence and circuit law, respectively—two

types of law that may not form the basis for habeas relief. To secure habeas relief, a Petitioner must demonstrate that a state court ruling is contrary to or an unreasonable application of Supreme Court precedent. *Bond v. Beard*, 539 F.3d 256, 263 (3d Cir. 2008), *as amended* (Oct. 17, 2008) ("AEDPA bars habeas relief unless the state court decision is contrary to or an unreasonable application of clearly established Supreme Court law ....") (citations omitted). Because Petitioner has not made this threshold showing, [his claim] necessarily fails.

*Id.* As in *Parlin*, Petitioner bases his claim on Ninth Circuit case law as established in *Binder* and New Jersey state law. A violation of either is insufficient to establish an entitlement to habeas relief, and Petitioner has failed to establish that this ruling was in violation of some unidentified Supreme Court case, nor that it involved an unreasonable application of the facts. Thus, as in *Parlin*, Petitioner's challenge must fail to the extent he asserts that it arises out of alleged violations of *Michaels* or *Binder*, and does not assert a violation or unreasonable application of any clearly established federal law in the form of a Supreme Court holding. As this Court is aware of no Supreme Court case law finding that it is per se violative of federal law for a jury to have access to and the ability to replay videotaped statements, Petitioner's claim is without merit to the extent he asserts that his rights were violated simply because the jury had the ability to play the statements. *Id.*; *see Magee v. Smith*, 403 F. App'x 84, 86 (7th Cir. 2010) (finding no *Strickland* prejudice arising out of the ability of the jury to replay taped statements admitted into evidence, as there would have been no issue had the replay been conducted in open court rather than in the jury room).

Petitioner also argues, however, that the ability of the jury to replay the video statements, which were admitted into evidence, violated his right to fundamental fairness because the jury may have placed undue emphasis on the taped statements by repeatedly viewing them out of the view of the court. Petitioner, however, omits several key factual occurrences during trial in making that

claim. First, the Court notes that, during jury instructions, the Court specifically gave a jury instruction regarding the fact that the jury had already viewed the videos more than once, informing the jury that "the fact that you saw a videotape statement played twice does not mean the evidence should be given any greater weight by you. Indeed, it is up to you as the sole triers of fact to determine what weight, if any, you should give to such evidence." (Document 37 attached to ECF No. 20 at 48). Second, when the question of how to run a playback came up, defense counsel endorsed permitting the jurors to have the tapes in the jury room and to play them for themselves, rather than have a court officer show them the tape, remove it, and return. (*See id.* at 85-87). Counsel thus did not view permitting the jury to control the playback to be fundamentally unfair, nor to unduly prejudice her client.[5]

In making his claim, Petitioner assumes, rather than shows, that he was actually prejudiced by the decision of the trial court to permit the viewing of the tapes in the jury room, apparently with defense counsel's blessing. Given the trial court's specific admonition that the jury should not give evidence special weight just because it was seen multiple times, the lack of an objection from trial counsel to permitting the jury to re-watch the tapes in the jury room, and the lack of any evidence that this decision produced actual prejudice to Petitioner, this Court perceives no basis on which the Court could find that the procedures used in this matter were fundamentally unfair. Instead, it fully appears that the trial court gave an appropriate instruction and followed a reasonable course in light of the opinions and arguments of counsel, and reached an entirely fair conclusion. As previously noted, this Court is aware of no Supreme Court case which renders the procedure used in this matter unreasonable, nor any finding such a procedure fundamentally unfair.

---

[5] Counsel did object to the presence of the transcripts, but the trial judge decided that the transcripts would only be available while the jury was watching the video and would be returned as soon as the jury was finished, which apparently assuaged counsel's concern. (*Id.* at 87-89).

Nor does this Court find any unreasonable application of the facts within the trial court's actions or the denial of appellate relief on that basis. The decision of the state courts to reject Petitioner's claim was thus neither an unreasonable application of the facts nor of applicable Supreme Court case law, and Petitioner has thus failed to establish any basis for habeas relief.[6]

Turning to Petitioner's confrontation argument regarding Ms. Kirkjian in relation to the statements of C.L. and L.L., Petitioner contends that the tapes, in the hands of the jury, amounted to the addition of her testimony without cross-examination into his trial. Because Petitioner's direct appeal had concluded prior to the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), and *Crawford* was not retroactively applicable to cases on collateral review at the time *Crawford* was decided, *see Whorton v. Bockting*, 549 U.S. 406, 409, 416-21 (2007), Petitioner's challenge would instead have to rely on the previously applicable law – the Supreme Court's holding in *Ohio v. Roberts*, 448 U.S. 56 (1980). Under *Roberts*, the confrontation clause "does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears 'adequate indicia of reliability,'" a test which is met when the "evidence . . . either fall[s] within a 'firmly rooted hearsay exception' or bear[s] 'particularized guarantees of trustworthiness.'" *Crawford*, 541 U.S. at 40 (quoting *Roberts*, 448 U.S. at 66).

Under *Roberts*, Petitioner's alleged confrontation challenge bears several issues. First, Kirkjian was, pursuant to the trial records and trial counsels' testimony at the PCR hearing, available for cross-examination, but was not called to testify by counsel because it would have been more harmful than helpful for counsel to call her. Second and more importantly, the trial court in this matter, in admitting the recorded statements, expressly made a factual finding that the

---

[6] That Petitioner has not shown, rather than simply asserted, that this decision produced a substantial and injurious result, his claim would fail for that reason as well as any error appears to have been harmless. *Brecht*, 507 U.S. at 631.

recorded statements were reliable and trustworthy. (*See* Document 18 attached to ECF No. 20 at 50-55). Because that conclusion was not unreasonable, and as Petitioner has presented no evidence suggesting it to be so, it is entitled to deference and the presumption of correctness, and would render the statements in the recordings non-violative of the Confrontation Clause under *Roberts*.

Even were this not the case, Petitioner's attempt at a Confrontation Clause claim has a more basic problem – any testimony on the tapes which actually prejudiced Petitioner came not from the official who conducted the interviews, but rather from the testimony of the children themselves, who were called as trial witnesses and who were thus subject to cross-examination. As such, the presence of Kirkjian standing alone did not prejudice Petitioner, and it is clear there was no Confrontation Clause issue as to the children's own statements. Because Kirkjian's statements on the tape were thus not capable of causing a substantial and injurious effect upon the result of trial in light of the clearly admissible statements of the children, the presence of Kirkjian's statements on the video was ultimately harmless and cannot form the basis of habeas relief. *See Adamson v. Cathel*, 633 F.3d 248, 259-60 (3d Cir. 2011) (Confrontation Clause habeas challenges are subject to *Brecht* harmless error review and will only merit relief where the petitioner suffered actual prejudice in the form of substantial and injurious effect upon the result of the trial). Thus, the fact that Kirkjian was on the tapes as well as the girls was utterly harmless in light of the testimony of the girls (to say nothing of Petitioner's own confession) and cannot form the basis of habeas relief for Petitioner.


## 4. Petitioner's Speedy Trial claim

Petitioner also asserts that he was denied his right to a speedy trial when he was tried nearly a decade after his arrest following numerous findings that he was initially incompetent to stand

trial. To determine whether a petitioner's Sixth Amendment right to a speedy trial has been violated, a court "must consider both the defendant's and the prosecution's conduct and consider four factors among others specific to the given case, namely: (1) the length of delay; (2) the reason for the delay; (3) whether, when, and how the defendant asserted his right to a speedy trial; and (4) prejudice to the defendant by the delay. *Barker v. Wingo*, 407 U.S. 514, 530 [(1972)]." *United States v. Tulu*, 535 F. Supp. 2d 492, 503 (D.N.J. 2008); *see also United States v. Claxton*, 766 F.3d 280, 293 (3d Cir. 2014); *United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009). None of the factors is "'either a necessary or sufficient condition,' and the factors 'must be considered together with such other circumstances as may be relevant.'" *Battis*, 589 F.3d at 678 (quoting *Barker*, 407 U.S. at 533). When evaluating the reason for the delay, the central issue is "whether the government or the criminal defendant is more to blame for that delay," with government created or neutral causes for delay (such as negligence, busy court schedules, etc.) weighing against the state to varying extents according to the state's culpability for the delay, while delays attributable to joint requests, extensive pre-trial proceedings, or the petitioner's own actions weighing against the petitioner. *Doggett v. United States*, 505 U.S. 647, 651 (1992); *see United States v. Corbin*, 607 F. App'x 136, 139 (3d Cir. 2015). In evaluating the prejudice prong of *Barker*, the Court's chief concern should be what impairment, if any, accrued to the defense based on the passing of time, the dimming of memories, and loss of potentially exculpatory evidence. *Doggett*, 505 U.S. at 654; *Barker*, 407 U.S. at 532.

In denying Petitioner's motion to dismiss on speedy trial grounds, the state trial court noted that, although there had been eight years of delay at the time the speedy trial motion had been decided, much of that delay arose out of Petitioner's having been declared incompetent – which caused much of the delay between 1991 and 1995, and that a further one to two years of the delay

arose out of Petitioner's appeal of his being found competent to stand trial in 1995. (*See* Document 19 attached to ECF No. 19 at 24-26). The court also noted that significant further portions of the delay arose out of Petitioner's various motions and applications to the court. (*Id.* at 25). The trial court likewise noted that, while Petitioner had raised his rights, he only did so with any real force "near the end" of the pre-trial period. (*Id.*). The trial court then turned to the final factor, prejudice, and noted that counsel had been unable to identify any evidence that had been lost, nor any witnesses who had died. (*Id.* at 25-26). The court likewise rejected the contention that the departure of some witnesses from New Jersey amounted to prejudice in light of the lack of any evidence showing that they could not be produced were counsel to attempt to produce them. (*Id.* at 25). Based on these findings, the trial court denied the motion as the court was "satisfied" that the case would soon proceed to trial, and that Petitioner had shown no prejudice and had himself been responsible for significant portions of the admittedly lengthy delay. (*Id.* at 26). The Appellate Division affirmed this decision on appeal "essentially for the reasons" specified by the trial judge. (Document 24 attached to ECF No. 7 at 11).

As the trial court noted, most of the delay in this matter was the result of Petitioner's competency hearings, and the appeals therefrom, and much of the remaining delay resulted not from the state's actions, but from Petitioner's own motions and the proceedings arising therefrom, and, as such, although the delay in this matter was quite lengthy, it cannot squarely be placed at the feet of the state. In light of those facts, and the failure of defense counsel to present any clear prejudice which had resulted from the delay, the state courts' rejection of Petitioner's speedy trial claim was neither contrary to nor an unreasonable application of the *Barker* standard, and is therefore not sufficient to establish a basis for habeas relief.

Petitioner, in his brief, attempts to assert several additional bases for prejudice which were not asserted before the state trial court – the need to constantly refresh the recollection of various witnesses and the use of leading questions to deal with clouded memories, alleged hearsay, and various forms of alleged "misconduct" by the prosecutor related to Petitioner's other claims. Of these asserted bases for speedy-trial prejudice, the only one which Petitioner asserts which actually arises out of the delay in Petitioner's trial was the need to refresh the recollection of various witnesses. Although it is fair to suggest that leading and refreshing were necessary due to the length of the delay in this case, Petitioner has not actually shown that he was prejudiced by the lack of memory for the state's witnesses. Petitioner has not shown that any real exculpatory evidence was lost during the delay, nor were there any defense witnesses who became unavailable. Any dimming of memories of the state's key witnesses, including the victims, accrued to the benefit of Petitioner – permitting challenges to their memories of events and in turn their credibility – and thus did not amount to prejudice. None of the remaining forms of prejudice Petitioner asserts clearly derived from the passage of time, or the lack of a speedy trial, and therefore Petitioner's remaining assertions do not support his speedy trial claim. As such, this Court finds that the state courts' conclusion that Petitioner has not shown that he was prejudiced sufficient to require the dismissal of his charges in light of the other facts at play in his criminal matter was neither unreasonable nor contrary to *Barker*, and Petitioner is not entitled to habeas relief on speedy trial grounds.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has

"made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because all of Petitioner's claims are either without merit or otherwise insufficient to warrant habeas relief, Petitioner has failed to make a substantial showing of the denial of a constitutional right. As such, and because jurists of reason could not disagree with this Court's denial of Petitioner's habeas petition, Petitioner's claims are inadequate to deserve encouragement to proceed further and Petitioner is denied a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petitions for a writ of habeas corpus (ECF Nos. 1, 12) are DENIED and Petitioner is DENIED a certificate of appealability. An appropriate order follows.


JOSE L. LINARES,
Chief Judge, United States District Court

Dated: August 2nd , 2017